# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| RENÉ SCHNEIDER, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 01-1902 (RMC) |
| ) | |
| HENRY A. KISSINGER, *et al.*, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION

This lawsuit challenges covert actions allegedly directed by high-level United States officials in connection with an attempted coup in Chile in 1970 designed to prevent the election of Dr. Salvadore Allende as Chile's first Socialist President.[1]  General René Schneider, then Commander-in-Chief of the Chilean Army, opposed military intervention in the electoral process. As a result, the United States allegedly plotted with Chilean nationals to neutralize him.  General Schneider was shot during a failed kidnaping attempt on October 22, 1970, and died from his wounds a few days later.  Two of General Schneider's children and his Personal Representative, suing on behalf of his estate, seek to hold the United States and Henry A. Kissinger, former Assistant for National Security Affairs to President Richard M. Nixon, responsible for the General's death.

---

[1]  As explained below, Dr. Allende, the leader of Chile's leftist coalition party, won a plurality of the votes in that country's 1970 presidential election.  The Chilean Congress later elected him as President.  *See infra* Part I.

Pending before the Court are the defendants' motion to dismiss and renewed motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.[2]  The plaintiffs oppose these motions and also move to strike the United States Attorney General's certification that Dr. Kissinger was acting in his official capacity when the conduct alleged in the amended complaint took place.  For the following reasons, the Court concludes that this case is non-justiciable because the plaintiffs' claims present a political question committed to the Executive and Legislative Branches.  In the alternative, the Court finds that the FTCA requires substitution of the United States for Dr. Kissinger and that the plaintiffs' allegations are barred by the doctrine of sovereign immunity.  The motions to dismiss will be granted, the motion to strike will be denied, and the case will be dismissed.

I.    **BACKGROUND FACTS**[3]

Plaintiffs René and Raúl Schneider are two of General Schneider's sons.  Plaintiff José Pertierra is the Personal Representative of General Schneider's estate and is suing in that capacity.  Defendant Dr. Kissinger served as National Security Advisor to former President Nixon

---

[2]  The defendants filed a motion to dismiss on November 9, 2001, which was fully briefed. On November 12, 2002, the plaintiffs filed an amended complaint, which added a claim under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346 *et seq.*, and removed as a defendant Richard M. Helms, who was Director of the Central Intelligence Agency ("CIA") from 1966 to 1973.  The defendants then renewed their motion to dismiss and that, too, has since been fully briefed.  The parties ask the Court to consider all briefs, as they did not repeat their initial arguments in response to the amended complaint.  The complaints and briefs shall be identified as I and II to distinguish them as necessary:  Compl. I, Defs.' Mot. I, Pls.' Opp. I, Defs.' Reply I; Compl. II, Defs.' Mot. II, Pls.' Opp. II, Defs.' Reply II.

[3]  The facts are taken from the two complaints.  Although they are "vigorously contested" by the defendants, Defs.' Mot. I at 1, the Court assumes that these facts are true for the purpose of ruling on the instant motions, which seek dismissal for lack of jurisdiction and for failure to state a claim upon which relief can be granted.  *See infra* Part II.

from 1969 to 1973.[4]  The United States Attorney General certified on November 2, 2001, that Dr. Kissinger was acting "within the scope of federal office or employment at the time of the incident out of which the plaintiffs' claims arose" and now seeks to substitute the United States for Dr. Kissinger as a defendant.  Cert. of John Lodge Euler (attached to Defs.' Mot. I).

As alleged by the plaintiffs, the following events have had a profound impact on Chile's political, social, and economic environment.  On September 4, 1970, Dr. Allende won a slight plurality of the votes (36.3%) in Chile's presidential election.  Because there was no clear victor, the Constitution of Chile provided that its Congress, in joint session, would determine who would become President from the two highest contenders.  The Chilean Congress traditionally had confirmed the candidate who received the greatest number of popular votes; hence, it was expected that the Congress would ratify Dr. Allende's election on October 24, 1970.

Key officials in the United States Government, including former President Nixon, wanted to prevent Dr. Allende, a self-proclaimed Marxist, from taking power.[5]  On September 12,

_____

[4]  Dr. Kissinger also held the position of Secretary of State from 1973 to 1977.

[5]  The defendants recount some of the history of that time:

> [I]n the spring of 1970, the Soviet Union moved troops and air defense missiles into Egypt to strengthen the defense of the Suez Canal.  In September, several aircraft highjackings occurred in the Middle East.  Syria invaded Jordan, where the captured aircraft and their passenger hostages had been flown.  United States forces in Europe were placed on alert before the United States both prevailed upon the Soviet Union to pressure the Syrians to withdraw and successfully negotiated an end to the hostage crisis.  While these events were playing out in the Middle East, information came to light that the Soviets . . . were building a submarine base in Cuba . . . [which] became public on September 25, 1970.  These events . . . heightened the United States' concern over the prospect that Chile

(continued...)

1970, U.S. Ambassador to Chile Edward Korry advised, "[The] Chilean military will not, repeat not, move to prevent Dr. Allende's accession, barring [the] unlikely situation of national chaos and widespread violence." Compl. II ¶ 18 (internal quotation marks omitted).  President Nixon then met with Dr. Kissinger, Mr. Helms, and Attorney General John Mitchell on September 15, 1970, and "ordered that the necessary steps be taken to prevent Dr. Allende from becoming President of Chile. Particularly, President Nixon instructed the CIA to 'play a direct role in organizing a military coup d'etat in Chile.'"  Compl. I ¶ 18.  President Nixon stated that "he was 'not concerned' about the 'risks involved[]'" with his decision and allocated $10 million to effect a military coup.  *Id.*

The efforts to prevent Dr. Allende from assuming office allegedly proceeded on two tracks.

> "Track I" comprised covert political, economic, and propaganda activities approved by the 40 Committee, a sub-cabinet level body of the Executive Branch chaired by Defendant Kissinger  whose overriding purpose was to exercise control over covert operations abroad.  The activities were designed to induce Dr. Allende's opponents in Chile to prevent his assumption of power, either through political or military means.  "Track II" activities, in turn, were directed "towards actively promoting and encouraging the Chilean military to move against Allende."

Compl. II ¶ 19.  The plaintiffs assert that only Dr. Kissinger and top CIA officials were informed of the second track.  *See id.* ¶ 20.  Specifically, the State Department was not informed of it.  *Id.*

In October 1970, Ambassador Korry was authorized to encourage a military coup and to intensify contacts with Chilean military officers to assess their potential support.  He reported to

---

[5](...continued)
> under a Marxist president might become yet another Communist base
> in the Western Hemisphere.

Defs.' Mot. I at 7 (citations omitted).

Dr. Kissinger that "General Schneider would have to be neutralized, by displacement if necessary" for any coup to be successful. *Id.* ¶ 22 (internal quotation marks omitted). Acting on this information, the CIA contacted and worked with several coup plotters, including retired Chilean General Roberto Viaux and General Camilo Valenzuela, who was Commander of the Santiago Garrison. Within the first weeks of October, the defendants came to regard General Viaux as "the best hope for carrying out the CIA's Track II mandate." *Id.* ¶ 28 (internal quotation marks omitted). General Viaux had ties to *Patria y Libertad*, a right-wing paramilitary group in Chile. Between September 4 and October 24, 1970, the CIA provided *Patria y Libertad* with $38,000. *Id.* ¶ 27. Around October 13, 1970, the CIA gave General Viaux $20,000 in cash and promised him a life insurance policy of $250,000. *Id.* ¶ 28. In addition, U.S. Army Attaché Paul Wimert delivered to members of General Valenzuela's faction six tear gas grenades, submachine guns, and ammunition. *Id.* ¶¶ 36-37.

On October 14, 1970, the CIA was informed that General Viaux planned to kidnap General Schneider within 48 hours to effect the coup. The amended complaint alleges that the defendants "never gave any instruction to leave General Schneider unharmed" and that "[i]t was foreseeable . . . that the kidnaping would create a grave risk of death to General Schneider and consequent harm to his family." *Id.* ¶ 30. On October 16, 1970, the CIA ordered its operatives in Chile to "continue their work of promoting a successful coup in spite of 'other policy guidance' that they may receive from other branches of the U.S. government." *Id.* ¶ 33.

After two unsuccessful kidnaping attempts, General Schneider was fatally injured during a third attempted kidnaping by members of General Viaux's faction on October 22, 1970. He died from his gunshot wounds three days later. *Id.* at ¶ 43. General Viaux, among others, was

eventually convicted by a Chilean military court on charges of kidnaping and conspiring to cause a coup.

## II.  LEGAL STANDARDS

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, the plaintiffs bear the burden of proving by a preponderance of the evidence that the Court has subject matter jurisdiction to hear this case.  *Jones v. Exec. Office of the President*, 167 F. Supp. 2d 10, 13 (D.D.C. 2001).  In deciding such a motion, the Court must accept as true all of the factual allegations set forth in the amended complaint; however, such allegations "'will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim."  *Grand Lodge of the Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13-14 (D.D.C. 2001) (quoting 5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1350).  The Court may consider matters outside the pleadings.  *Lipsman v. Sec'y of the Army*, No. 02-0151, 2003 U.S. Dist. LEXIS 4882, at *6 (D.D.C. Mar. 31, 2003).

A motion to dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the amended complaint.  The Court must accept as true all of the plaintiffs' well-pled factual allegations and draw all reasonable inferences in favor of the plaintiff; however, the Court does not need to accept as true any of the plaintiffs' legal conclusions.  *Alexis v. District of Columbia*, 44 F. Supp. 2d 331, 336-37 (D.D.C. 1999). "[An amended] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief."  *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

## III.    ANALYSIS

       The plaintiffs seek to hold the United States and Dr. Kissinger liable for the attempted

kidnaping and death of General Schneider under various U.S. laws and treaties, the "law of

nations";[6] Chilean law; statutes and the common law of the District of Columbia; and, in the

---

       [6] The defendants allegedly committed torts in violation of the law of nations, as codified in the following international treaties, declarations, laws, and resolutions, including:

       a)     Charter of the United Nations, June 26, 1945, 59 Stat. 1031, TS 993;

       b)     Universal Declaration of Human Rights, G.A. Res. 217 (III), U.N. Doc. A/810 at 71 (1948);

       c)     Charter of the Organization of American States, 2 U.S.T. 2394, 119 U.N.T.S. 3, *as amended*, Protocol of Buenos Aires of 1967, 21 U.S.T. 607, 721 U.N.T.S. 324;

       d)     Declaration on the Protection of All Persons From Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 3452 (XXX), annex, 30 U.N. GAOR Supp. (No. 34) at 91, U.N. Doc. A/10034 (1975);

       e)     Inter-American Convention to Prevent and Punish Torture, Dec. 9, 1985, 25 I.L.M. 519;

       f)     American Declaration of Rights and Duties of Man, O.A.S. Res. XXX, adopted by the Ninth International Conference of American States (1948), *reprinted in* Basic Documents Pertaining to Human Rights in the Inter-American System, OEA/Ser. L.V/II.82 doc. 6 rev. 1 at 17 (1992);

       g)     Inter-American Convention on the Forced Disappearance of Persons, June 9, 1993, 33 I.L.M. 1529;

       h)     United Nations General Assembly Resolution and Declaration on the Protection of All Persons from Enforced Disappearance, Dec. 18, 1992, 32 I.L.M. 903;

       i)     The Charter of the International Military Tribunal, Nuremberg, August 8, 1945, confirmed by G.A. Res. 3, U.N. Doc. A/50 (1946);

       j)     The Rome Statute of the International Criminal Court, United Nations Diplomatic Conference of Plenipotentiaries on the Establishment of an International Criminal Court, July 17, 1998, U.N. Doc. A/CONF. 183/9, *reprinted in* 37 I.L.M. 999;

       k)     Statute for the International Criminal Tribunal for Rwanda,

(continued...)

alternative, the FTCA.  They assert nine claims in their amended complaint:  summary execution;

torture; cruel, inhuman, or degrading treatment; arbitrary detention; wrongful death; assault and

battery; two counts of intentional infliction of emotional distress; and negligent failure to prevent

summary execution, arbitrary detention, cruel, inhuman, or degrading treatment, torture, wrongful

death, and assault and battery.  The defendants move to dismiss, arguing that the political question

doctrine renders non-justiciable all of the plaintiffs' claims; that sovereign immunity bars the claims

against the United States; and that the amended complaint fails to state a cognizable claim against

Dr. Kissinger, in part because of substitution under the FTCA.  The plaintiffs counter that the

political question doctrine is inapplicable to mere torts claims; that the United States has implicitly

waived its sovereign immunity; and that Dr. Kissinger was not acting within the scope of his

employment when he allegedly committed the torts at issue and is not entitled to qualified immunity.

### A.      Political Question Doctrine

> The political question doctrine excludes from judicial review those
> controversies which revolve around policy choices and value
> determinations constitutionally committed for resolution to the halls
> of Congress or the confines of the Executive Branch.  The Judiciary
> is particularly ill suited to make such decisions, as "courts are
> fundamentally underequipped to formulate national policies or
> develop standards for matters not legal in nature."

---

[6](...continued)
> Nov. 8, 1994, U.N. SCOR, 49th Sess., 3453rd mtg., at 1, U.N. Doc.
> S/RES/955, *reprinted in* 33 I.L.M. 1598 (1994);
> l)      Declaration on the Elimination of Violence Against Women,
> G.A. [R]es. 48/104, 48 U.N. GAOR Supp. (No. 49) at 217, U.N. Doc.
> A/48/49 (1993); and
> m)      Inter-American Convention on the Prevention, Punishment,
> & Eradication of Violence Against Women, 33 I.L.M. 1534 (in force
> Mar. 5, 1995).

Compl. II ¶ 6.

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986) (quoting *United States ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1379 (D.C. Cir. 1981) (footnote omitted), *cert. denied*, 455 U.S. 999 (1982)).  This is just such a case.

It is difficult to see through the lens of more than 30 years ago, when world events conspired to cause concern at the highest echelons of the United States Government that communism would spread across Latin America if Dr. Allende were elected President of Chile.  Plaintiffs argue that the President of the United States directed his National Security Advisor and the CIA to assist a coup attempt in Chile to avoid a vote by Chile's Congress.  They further assert that these officials carried out a covert program in furtherance of the President's directions that included an unsuccessful attempt to kidnap General Schneider and thereby caused his death.  Both parties reference extended investigations by the U.S. Congress into this extraordinary activity on the part of the United States to interfere with the democratic elections of another country.  With the events leading to General Schneider's death given detailed attention by the Executive and Legislative Branches, this lawsuit now asks the Judiciary to weigh into this matter and determine whether his estate and two heirs are entitled to recompense.

The political question doctrine is "primarily a function of the separation of powers." *Baker v. Carr*, 369 U.S. 186, 210 (1962).  The Supreme Court has enumerated factors that may render a case non-justiciable:

> Prominent on the surface of any case held to involve a political question is found a [1] textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of respect due coordinate branches of

government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment of multifarious pronouncements by various departments on one question.

*Id.* at 217.  Applying the first four factors to the plaintiffs' claims, the Court concludes that *Baker* and its progeny strongly favor dismissal of this case.[7]

### 1.    This Lawsuit Raises Policy Questions that Are Textually Committed to a Coordinate Branch of Government.

The decision to support a coup of the Chilean Government to prevent Dr. Allende from coming to power, and the means by which the United States Government sought to effect that goal, implicate policy decisions in the murky realm of foreign affairs and national security best left to the political branches.  "The conduct of the foreign relations of our Government is committed by the Constitution to the Executive and Legislative – 'the political' – Departments of the Government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision."[8]  *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918); *see also Comm. of United States Citizens*, 859 F.2d at 933-34 ("[F]oreign policy decisions are the subject of just such a textual commitment.").  In *Baker v. Carr*, however, the Supreme Court cautioned that "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial

---

[7]    The final two *Baker* factors do not affect this finding.  *See id.* (Dismissal may be appropriate if only "one of these formulations is inextricable from the case at bar[.]").

[8]    The "'classical' version" of the political question doctrine arises when the U.S. Constitution textually commits an issue to the President or Congress.  *Comm. of United States Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 933 (D.C. Cir. 1988) (quoting LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW 96 (2d ed. 1988)).  "Deciding whether a matter has in any measure been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed, is itself a delicate exercise in constitutional interpretation."  *Baker,* 369 U.S. at 211.

cognizance." 369 U.S. at 211.  Determining whether a particular foreign affairs context presents a

non-justiciable political question therefore requires a case-by-case inquiry.

The plaintiffs assert that this is a "mere tort" case that does not raise any political

questions.  *See* Pls.' Opp. I at 12-13.  In support, they cite *Klinghoffer v. S.N.C. Achille Lauro*, 739

F. Supp. 854 (S.D.N.Y. 1990), *vacated by* 937 F.2d 44 (2d Cir. 1991), in which the Second Circuit

held that the political question doctrine did not bar a lawsuit against the Palestine Liberation

Organization ("PLO") for allegedly hijacking an Italian cruise liner and killing Leon Klinghoffer,

an American passenger.[9]  The PLO argued that "issues of its liability for a terrorist attack are foreign

policy questions not properly subject to judicial determination and that a court's resolution of them

would infringe the foreign policy authority committed to other branches of government."

*Klinghoffer*, 739 F. Supp. at 859.  In rejecting that legal position, the Second Circuit determined that

it was "faced with an ordinary tort suit, alleging that the defendants breached a duty of care owed

to the plaintiffs or their decedents.  The department to whom this issue has been 'constitutionally

committed' is none other than our own – the Judiciary."  *Klinghoffer*, 937 F.2d at 49.

The plaintiffs' reliance on *Klinghoffer* is misplaced.  That case is readily

distinguishable from the situation at hand.  First and foremost, no policy decision by a co-equal

branch of the U.S. Government was implicated in *Klinghoffer*; the relevant defendant was a foreign

political organization.  The plaintiffs here, in contrast, ask this Court to assess the reasonableness

of the Executive Branch's decision to seek – perhaps through violent means – a change in the

---

[9]  Leon Klinghoffer's widow and estate sued the owner of the Achille Lauro vessel, travel
agencies, and other entities, which then "impleaded the PLO, seeking indemnification or
contribution for any damages awarded against them on plaintiffs' claims and compensatory and
punitive damages against the PLO for tortious interference with their businesses." *Klinghoffer*, 739
F. Supp. at 857.  Later, other Achille Lauro passengers filed two direct actions against the PLO.

makeup of a foreign sovereign.  Second, the PLO invoked the political question doctrine to avoid

a ruling by the District Court that, it argued, would "surely exacerbate the controversy surrounding

the PLO's activities." *Id.*  In response, the Second Circuit noted, "The fact that the issues before us

arise in a politically charged context does not convert what is essentially an ordinary tort suit into

a non-justiciable political question." *Id.*  The defendants in the instant action do not rely on the

political question doctrine simply to avoid debate around the world; they base their arguments on

the more legitimate premise that a decision here might entail the Judiciary's potential encroachment

on the President's foreign policy determinations.

      The analysis in *Chaser Shipping Corp. v. United States*, 649 F. Supp. 736, 739

(S.D.N.Y. 1986), *aff'd*, 819 F.2d 1129 (2d Cir. 1987), *cert. denied*, 484 U.S. 1004 (1988), *rehrg.*

*denied*, 487 U.S. 1243 (1988), another case from the Second Circuit, is more applicable to this

lawsuit.  In *Chaser Shipping*, the Second Circuit affirmed the dismissal, on political question

grounds, of tort claims brought by a foreign shipping company against the United States for the

alleged failure to use due care in conducting mining operations in a Nicaraguan harbor.  The United

States District Court for the Southern District of New York concluded:

> For the judiciary to monitor the conduct of covert military operations,
> whether before or after their occurrence, would be an exercise of
> nonjudicial discretion which *Baker* counsels the courts to avoid.
> Such scrutiny by the judicial branch would also fail to accord
> appropriate respect to a coordinate branch of the Government.  To
> avoid becoming embroiled in sensitive foreign policy matters such as
> this one, the Court declines to interpose its own will above the will
> of the President or the Congress.

*Id.* at 739 (citations omitted).

      The plaintiffs contend that the foreign policy of the United States is not at issue

because "the events complained of do not relate to a decision regarding the 'recognition of foreign

governments,' or a 'President's decision to deploy military force against a foreign government[.]'"

Pls.' Opp. I at 13 (citations to the defendants' brief omitted). According to the plaintiffs, they "do

not ask this Court to 'decide that an Allende government would have been better or worse for the

United States' interests.' . . . Rather, Plaintiffs seek only a vindication of personal rights." *Id.* This

argument begs the question. The legality or propriety of the defendants' actions in allegedly

supporting the attempted kidnaping and resulting death of General Schneider – *i.e.*, whether such

conduct were reasonable or *ultra vires* – can be ascertained only by an examination of the genesis

of U.S. foreign policy in 1970 and the President's decisions on how to implement it. For better or

worse, the plaintiffs' claims arise within the context of the United States's conduct of its foreign

relations. Second-guessing the methods by which the Executive Branch chose to deal with a new

Socialist regime in Chile in the 1970s *vis a vis* their effect on foreign citizens is not the proper role

of this Court.[10]

---

[10] The plaintiffs cite *Committee of United States Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 933-35 (D.C. Cir. 1988), for the proposition that "vindication of personal rights" is not barred by the political question doctrine. Pls.' Opp. I at 13. While that may be true in other circumstances, it does not pertain to the instant case. In *Committee of United States Citizens*, a group of U.S. citizens living in Nicaragua advanced Fifth Amendment claims challenging the United States' support of military actions by the so-called "Contras." The D.C. Circuit declined to employ the political question doctrine to dismiss their claims, stating that "the Supreme Court has repeatedly found that claims based on [due process] rights are justiciable, even if they implicate foreign policy decisions." *Comm. of United States Citizens*, 859 F.2d at 935. "It is well established[, however,] that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001); *see also Johnson v. Eisentrager*, 339 U.S. 763, 784-85 (1950) (Fifth Amendment protections do not extend to aliens outside the territory of the United States). Because General Schneider and his heirs were, and are, foreign citizens in Chile, there is little worry that applying the political question doctrine here would "'give the Executive *carte blanche* to trample the most fundamental liberty and property rights of *this country's* citizenry.'" *Comm. of United States Citizens*, 859 F.2d at 935 (quoting *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1515 (D.C. Cir. 1984)) (emphasis added).

Indeed, the plaintiffs' tort allegations go to the very heart of the political question doctrine:  foreign policy directives from the President himself.  *See* Compl. I ¶18.  A government was poised to assume power in Chile that the President deemed inimical to the interests of the United States.  Whether Executive Branch judgments at that time were correct or wise is not the issue.  The question is whether the discretion to make such decisions and give directions lies solely within the political branches of Government or is subject to review by the Judiciary.[11]  Foreign affairs do not encompass only "United States policy *in general*" toward another country, Pls.' Opp. I at 15 (emphasis added), but also cover discrete choices made by the Executive and Legislative Branches concerning the full range of relationship issues between nations, not the least of which are the leadership and economic/social policies of a fellow country in the western hemisphere.

For these reasons, the first *Baker* factor militates toward a finding that this case is barred by the political question doctrine.

---

[11]  The plaintiffs assert that "Defendants willfully and wrongly excluded the Legislative branch from the process and therefore removed such action from the proper scope of their authority." Pls.' Opp. I at 14.  However, both the Executive and Legislative Branches need not concur on a course of action for it to constitute a matter of foreign relations.  These (foreign) plaintiffs do not appear to have standing to sue Executive Branch officials on behalf of a Legislature that was allegedly "misled and denied its proper role of involvement and oversight[.]" *Id.* at 15.  If President Nixon and Dr. Kissinger offended the sensibilities of the U.S. Congress by engaging in covert activities to prevent Dr. Allende from serving as Chile's President, it was up to the Congress to investigate – as it did – and to determine its further response, if any.  *See generally Crockett v. Reagan*, 720 F.2d 1355, 1356 (D.C. Cir. 1983) (affirming the "dismissal of a suit brought by 29 Members of Congress against President Reagan and other United States officials, challenging the legality of the United States' presence in, and military assistance to, El Salvador").

2.     **There Exist No Judicially Discoverable and Manageable Standards to Determine the Propriety of Executive Actions Involving Foreign Relations Decisions.**

Continuing with their theory that this lawsuit presents "mere torts," the plaintiffs argue that clear standards exist for resolving this matter.  Pls.' Opp. I at 12.  They claim that "the standards for evaluating wrongful death are well-established" under D.C. Code § 16-2701, and that the "Court need not depart from these in managing the instant action."  *Id.* at 15.  Without examining the specific elements of wrongful death, the surface of the amended complaint reveals that resolution of this case would require the Court to decide whether Dr. Kissinger's alleged decision to support the kidnaping of General Schneider in order to prevent Dr. Allende from gaining control of the Chilean Government was "wrongful."  This alone would call for a determination of whether it was proper for an Executive Branch official, without regard to potential adverse consequences, to support covert actions against an undesirable figure who was set to take power in a foreign nation.  Neither the D.C. Code nor the common law on wrongful death provides judicially manageable standards with which to make this policy call.

Several courts have come to a similar conclusion regarding torts allegedly committed by U.S. officials against foreigners outside the United States.  *See, e.g.*, *Industria Panificadora, S.A. v. United States*, 763 F. Supp. 1154 (D.D.C. 1991), *aff'd on other grounds*, 957 F.2d 886, 887 (D.C. Cir. 1992);  *Chaser Shipping Corp. v. United States*, 649 F. Supp. 736 (S.D.N.Y. 1986); *Sanchez-Espinoza v. Reagan*, 568 F. Supp. 596 (D.D.C. 1983), *aff'd on other grounds*, 770 F.2d 202, 206 (D.C. Cir. 1985).[12]  The District Court in *Industria Panificadora* held that it lacked judicially

---

[12]  The D.C. Circuit declined to rule on the applicability of the political question doctrine in both *Industria Panificadora* and *Sanchez-Espinoza*.  In each instance, the Court of Appeals found
(continued...)

manageable standards to decide whether the United States was negligent for failing to leave a sufficient police power in Panama after the U.S. Armed Forces ousted General Manuel Noriega. 763 F. Supp. at 1161 ("[W]hile plaintiffs carefully worded their amended complaint to suggest a basis in traditional tort concepts of due care and negligence, their allegations implicate broader political questions that encompass U.S. foreign policy and military operations."). "Such an inquiry would be fraught with national security considerations and unmanageable political and military issues." *Id.* Similarly, the District Court in *Chaser Shipping* "simply [did] not agree with plaintiffs that an inquiry into the issues of tort liability raised by their complaint would be a manageable one" because the claims turned on whether the President and CIA had exercised due care in conducting covert military operations in Nicaragua. 649 F. Supp. at 738. In *Sanchez-Espinoza*, the District Court dismissed on political question grounds claims against the U.S. Government for allegedly supporting paramilitary activities in an effort to overthrow the Nicaraguan Government. 568 F. Supp. at 602. "[T]he questions presented [in that case] require[d] judicial inquiry into sensitive military matters . . . [such as] covert activities of CIA operatives in Nicaragua and Honduras[.]" *Id.* at 600.

Resolving the present lawsuit would compel the Court, at a minimum, to determine whether actions or omissions by an Executive Branch officer in the area of foreign relations and

---

[12](...continued)
an alternative basis for sustaining the trial court's decision, while not specifically disavowing non-justiciability. *See Industria Panificadora, S.A.*, 957 F.2d at 887 ("[W]e need not and do not decide whether the 'political question' doctrine supplies an alternative ground for dismissal of the case."); *Sanchez-Espinoza*, 770 F.2d at 206 ("Without necessarily disapproving the District Court's conclusion that all aspects of the present case present a nonjusticiable political question, we choose not to resort to that doctrine for most of the claims."). While recognizing the caution of the D.C. Circuit in applying the political question doctrine, the Court nonetheless finds the reasoning of these District Judges persuasive.

national security were "wrongful" under tort law.  To gauge the reasonableness of these foreign policy decisions, the Court would have to measure and balance a myriad of thorny foreign and domestic political considerations, *i.e.*, the magnitude of any threat to the United States and its democratic allies from the spread of Marxism to Chile.  The Court lacks judicially discoverable and manageable standards to resolve these inherently political questions.  Under the second *Baker* factor, this case should be dismissed as non-justiciable.

### 3.   Judicial Resolution Would Require Evaluation of an Initial Policy Determination of a Kind Clearly For Nonjudicial Discretion.

The plaintiffs complain that Dr. Kissinger worked with the CIA to provide material aid to violent coup plotters without regard to the foreseeable impact on the safety and life of General Schneider.  They allege that Dr. Kissinger breached a duty to give explicit directions that General Schneider's well-being be protected.  However, the Executive Branch's alleged decision to support the kidnaping of General Schneider, in the face of a growing leftist regime in Chile, plainly required one or more initial policy determinations beyond the pale of judicial expertise.

The Supreme Court has emphasized that "the 'nuances' of 'the foreign policy of the United States . . . are much more the province of the Executive Branch and Congress than of this Court." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 386 (2000) (quoting *Container Corp. of Am. v. Franchise Tax Bd.*, 463 U.S. 159, 196 (1983)).  In response, the plaintiffs contend that "the Court is not here asked to pass judgment on any perceived value or danger of the Allende government to United States interests and need not make any policy determination[.]"  Pls.' Opp. I at 15.  While the plaintiffs are correct that the Court might be able to avoid evaluating the merits of a potential Allende Government in 1970, it would nonetheless be forced to pass judgment on the means used by the United States to keep that government from taking power.  In so doing, the Court

would naturally have to consider whether preventing Dr. Allende from becoming President of Chile was worth supporting a rebel military faction that would likely commit human rights violations.  The Hinchey Report to the Congress, quoted by the plaintiffs, illustrates some of the foreign policy implications:

> There is no doubt that some CIA contacts were actively engaged in committing and covering up serious human rights abuses.
>
> As a result of lessons learned in Chile, Central America and elsewhere, the CIA now carefully reviews all contacts for potential involvement in human rights abuses and *makes a deliberate decision balancing the nature and severity of the human rights abuses against the potential intelligence value of continuing the relationship.* These standards, established in the mid-1990s, would likely have altered the amount of contact we had with perpetrators of human rights violators in Chile had they been in effect at that time.

Report on CIA Activities in Chile, September 18, 2000, *available at* http://www.foia.state.gov/Reports/HincheyReport.asp)) (emphasis added).  Courts are decidedly ill-equipped to consider such questions as they are not privy to all relevant intelligence information, and they have no appropriate legal standard to determine the gravity of the threat to the United States that might be caused by a (hostile) foreign government or the likelihood that certain covert actions would ameliorate or exacerbate that threat.

Ruling on the propriety of relying on certain Chilean dissidents to kidnap General Schneider would require an initial policy determination of a kind that does not lie within judicial discretion.  This third *Baker* factor therefore counsels against the Court hearing this case.

### 4.    The Court Could Not Proceed Without Expressing A Lack of Respect to Coordinate Branches of Government.

It would be virtually impossible for the Court to resolve this case without either condemning officials of the Executive Branch for their actions or undermining the conclusions

reached by Congress in the Hinchey Report.  A court should refrain from entertaining a suit if it would be unable to do so without expressing a lack of respect due to its co-equal Branches of Government.  *See Baker v. Carr*, 369 U.S. at 217; *Chaser*, 649 F. Supp. at 739; *Sanchez-Espinoza*, 568 F. Supp. at 600.  In this circumstance, the Executive Branch participated in covert activities that the Congress later investigated.  It is not realistically possible for the Judiciary to add its voice or its opinion without contradiction to either or both of these other Branches.  Accordingly, the fourth *Baker* factor also leans toward dismissal.

**B.    Immunity**[13]

Both defendants claim immunity as an additional basis for dismissal.  As an initial matter, the Court agrees with the U.S. Attorney General that Dr. Kissinger was acting within the scope of his employment for purposes of this lawsuit; accordingly, the United States will be substituted for him as the sole defendant except for claims under the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350 note.  These TVPA claims are deficient, however, and will be dismissed for failure to state a claim upon which relief can be granted.  The remaining case against the United States will be dismissed based on its sovereign immunity**.**

**1.    The United States Was Properly Substituted for Dr. Kissinger under the Westfall Act.**

The Federal Employees Liability Reform and Tort Compensation Act of 1988 ("Westfall Act"), Pub. L. No. 100-694, 102 Stat. 4563 (codified in part at 28 U.S.C. §§ 2671, 2674, 2679), confers immunity on federal officials "by making an FTCA action against the Government

---

[13] Having determined that the plaintiffs' claims present a non-justiciable political question, the Court would normally end its decision.  However, alternative bases exist to dismiss this case and the D.C. Circuit has previously avoided reliance on the political question doctrine.  The Court will address alternative bases for dismissal should appellate review be sought.

the exclusive remedy for torts committed by [such] employees in the scope of their employment."

*United States v. Smith*, 499 U.S. 160, 163 (1991);  *see also* 28 U.S.C. § 2679(b)(1).

> When a federal employee is sued for a wrongful or negligent act, the [Westfall Act] empowers the Attorney General to certify that the employee "was acting within the scope of his office or employment at the time of the incident out of which the claim arose . . . ."  28 U.S.C. § 2679(d)(1).  Upon certification, the employee is dismissed from the action and the United States is substituted as defendant.

*Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 419 (1995).  This certification is not conclusive and a federal court examines the issue independently.  *Id.* at 434.  In general, the plaintiffs bear the burden of producing evidence that a defendant was acting outside the scope of his employment.[14]  *See Kimbro v. Velten*, 30 F.3d 1501, 1509 (D.C. Cir. 1994); *Wright v. United States*, No. 95-0274, 1996 U.S. Dist. LEXIS 21781, at *8 (D.D.C. Feb. 8, 1996).

The plaintiffs move to strike the U.S. Attorney General's certification that Dr. Kissinger was acting within the scope of his employment.  They assert that, "because Defendants' conduct constitutes a clear violation of peremptory norms of international law, such that can never be within the scope of employment, the certification by Defendant United States is improper."  Pls.' Opp. I at 5.  This statement, however, is based on an erroneous interpretation of the term "scope of employment."

The scope of employment of a federal employee is governed by state law.  *See Haddon v. United States*, 68 F.3d 1420, 1423 (D.C. Cir. 1995) (citing *Kimbro*, 30 F.3d at 1506).  On this issue, the District of Columbia looks to the Restatement (Second) of Agency, which provides:

_____

[14]  Given that the Court accepts as true the plaintiffs' *factual* assertions regarding the parameters of Dr. Kissinger's job role and duties, there is no need for an evidentiary hearing to resolve this legal issue.  *See Stokes v. Cross*, 327 F.3d 1210, 1216 (D.C. Cir. 2003) ("Not every complaint will warrant further inquiry into the scope-of-employment issue.").

> [c]onduct of a servant is within the scope of employment if, but only if: (a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; (c) it is actuated, at least in part, by a purpose to serve the master, and (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.

Restatement (Second) of Agency § 228(1).  Conduct must be "of the same general nature as that authorized" or "incidental to the conduct authorized" to be within the scope of employment.  *Id.* § 229.  For conduct to be "incidental" it must be foreseeable, meaning that it is a "direct outgrowth" of the performance of an employee's instructions or job assignment.  *See Haddon*, 68 F.3d at 1424.

The plaintiffs' theory that a violation of international law always falls outside the scope of a federal official's employment misconstrues "the scope" of this term.  It is well settled that an employee is capable of committing a variety of illegal or tortious acts for which his employer may be held liable, even though the employer did not hire him for that purpose.  This is, after all, the predicate of *respondeat superior* liability.  *See, e.g.*, *Weinberg v. Johnson*, 518 A.2d 985, 988 (D.C. 1986) ("The doctrine of *respondeat superior* is a doctrine of vicarious liability which imposes liability on employers for the torts committed by their employees within the scope of their employment.").[15]  Defining an employee's scope of employment is not a judgment about whether alleged conduct is deleterious or actionable; rather, this procedure merely determines *who* may be held liable for that conduct, an employee or his boss.[16]

---

[15]  *Weinberg* is a prime example of the breadth of the term "scope of employment."  In that case, the D.C. Court of Appeals sustained a jury verdict against the owners of a laundromat when an employee shot a patron in the face following an argument about missing shirts.  The Court of Appeals held that, as a matter of law, a reasonable jury could conclude that the employee "was acting within the scope of his employment" when he committed the shooting.  *Id.*

[16]  In cases where the United States is the employer, substitution under the Westfall Act may
(continued...)

The Court finds that Dr. Kissinger was acting within the scope of his employment as National Security Advisor to President Nixon when he allegedly conspired to kidnap General Schneider. The establishment of a Socialist Government in Chile would have had a substantive impact on U.S. foreign policy and would naturally implicate national security concerns for which Dr. Kissinger had some responsibility. Moreover, there is no allegation by the plaintiffs that Dr. Kissinger undertook these activities solely, if at all, for his own personal benefit. *Id.* at 990 ("The tort must be actuated, at least in part, by a purpose to further the master's business and not be unexpected in view of the servant's duties."). Indeed, the plaintiffs themselves initially averred that "President Nixon met with Defendant Kissinger . . . and *ordered* that the necessary steps be taken to prevent Dr. Allende from becoming President of Chile."[17] Compl. I ¶ 18 (emphasis added). The plaintiffs further stated in their first complaint that "President Nixon instructed the CIA to 'play a direct role in organizing a military coup d'etat in Chile' and to do quickly whatever could be done to prevent Dr. Allende from being seated." *Id.* Clearly, then, the conduct attributed to Dr. Kissinger occurred during the performance of his job function and, as conceded, at the express direction of the President.

Ordinarily, a ruling that Dr. Kissinger was acting within the scope of his employment would result in his dismissal from the case in favor of the United States. Immunity under the Westfall Act, however, does not apply to a civil action against a federal employee "which is brought for a violation of a statute of the United States under which such action against an individual is

---

[16](...continued)
have the practical effect of rendering tort claims unredressable because of sovereign immunity.

[17] The filing of the amended complaint, which omits specific references to President Nixon that were detailed in the first complaint, does not excise those allegations from history or this record.

otherwise authorized."  28 U.S.C. § 2679(b)(2)(B).  The plaintiffs argue that their claims under the

Alien Tort Claims Act ("ATCA"), 28 U.S.C. § 1350, international law, and the TVPA fall within

this exception.

Pursuant to the ATCA, "[t]he district courts shall have original jurisdiction of any

civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the

United States."  *Id.*  The plaintiffs assert that this statute establishes "both a private cause of action

and a federal forum where aliens may seek redress for violations of international law."[18]  Pls.' Opp.

I at 24.  The defendants counter that the ATCA creates no substantive rights or duties that can be

"violated" for purposes of the Westfall Act; rather, "§ 1350 contemplates that the district courts can

entertain an action for the violation of substantive rights conferred elsewhere, namely by the law of

nations or by a treaty of the United States."  Defs.' Mot. I at 25 (citing *Alvarez-Machain v. United

States*, 266 F.3d 1045, 1053-54 (9th Cir. 2001)).

In *Alvarez-Machain*, a Mexican doctor sued individual agents of the United States

Drug Enforcement Agency ("DEA"), among others, for "(1) kidnaping, (2) torture, (3) cruel and

inhuman and degrading treatment or punishment, (4) arbitrary detention, (5) assault and battery, (6)

false imprisonment, (7) intentional infliction of emotional distress, (8) false arrest, (9) negligent

employment, (10) negligent infliction of emotional distress, and (11) various constitutional torts"

after he was abducted from Mexico to stand trial in the United States.  266 F.3d at 1049.  A three-

judge panel on the Ninth Circuit affirmed the District Court's ruling that

---

[18]  Whether the ATCA really does provide a cause of action is unclear in this Circuit.
*Compare Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 777-82 (D.C. Cir. 1984) (Edwards, J.,
concurring), *and Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980), *with Al Doah v. United
States*, 321 F.3d 1134, 1146-47 (D.C. Cir. 2003) (Randolph, J., concurring), *and Tel-Oren*, 726 F.2d
at 801 (Bork, J., concurring).

> an action under the ATCA was not exempt from the exclusive
> remedy provision of the Liability Reform Act.  [The District Court]
> reasoned that "it is international law, not the ATCA," that gives
> individuals fundamental rights.  Therefore, a claim under the ATCA
> is based on a violation of international law, not of the ATCA itself.

*Id.* at 1053 (citing *United States v. Smith*, 499 U.S. 160 (1991)).[19]  This Court agrees with the Ninth

Circuit's logic and concludes that the ATCA itself cannot be violated for purposes of

§ 2679(b)(2)(B).

The plaintiffs also fail to defeat substitution on the grounds that "violations of

international law 'arise under' the laws of the United States for purposes of jurisdiction under 28

U.S.C. § 1331."  Pls.' Opp. I at 25.  The Westfall Act explicitly makes an exception for "a violation

of a statute of the United States[,]" not federal common law or the law of nations.  28 U.S.C.

§ 2679(b)(2)(B).  Even if "[s]ection 1331 provides an independent basis for subject-matter

jurisdiction over all claims alleging violations of international law, relying on the settled proposition

that federal common law incorporates international law[,]" Pls.' Opp. I at 25-26, it cannot possibly

be said that the plaintiffs bring suit for a violation of § 1331, which merely provides federal question

jurisdiction and not a cause of action.

In contrast, a violation of the TVPA arguably fulfills the requirements of

§ 2679(b)(2)(B).  *See* Defs.' Mot. I at 23.  Even so, this statute provides no relief against

Dr. Kissinger.  The TVPA imposes civil liability only on an individual acting "under actual or

apparent authority, or color of law, of any *foreign* nation."  TVPA § 2(a) (emphasis added).  In

---

[19]  The Ninth Circuit sitting *en banc* later adopted this analysis.  *Alvarez-Machain v. United States*, 331 F.3d 604, 631-32 (9th Cir. 2003) (en banc) ("[W]e agree with the three-judge panel's conclusion that the exemption does not apply here, and that the United States was properly substituted for the individual DEA agents."), *cert. granted*, 124 S. Ct. 821 (2003).

carrying out the direct orders of the President of the United States, *see* Compl. I ¶ 18, Dr. Kissinger was most assuredly acting pursuant to U.S. law, if any, despite the fact that his alleged foreign co-conspirators may have been acting under color of Chilean law.  In addition, the TVPA claims appear to be barred by Dr. Kissinger's qualified immunity from suit.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) ("[G]overnment officials performing discretionary functions[] generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.").  Since the TVPA was passed almost twenty-two years after the events in question, its proscriptions could not have been an accepted basis for personal liability in 1970.  Given this result, the Court does not need to determine whether Dr. Kissinger is entitled to absolute immunity as a senior White House aide "entrusted with discretionary authority in such sensitive areas as national security or foreign policy," an argument advanced by the defendants.[20]  *Id.* at 812.

### 2. The Doctrine of Sovereign Immunity Bars Claims against the United States.

"It is well established that 'the United States, as sovereign, is immune from suit save as it consents to be sued . . ., and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.'"  *In re Sealed Case No. 99-3091*, 192 F.3d 995, 999 (D.C. Cir. 1999) (quoting *United States v. Sherwood*, 312 U.S. 584, 586 (1941)).  Any waiver of sovereign

---

[20]  In *Halperin v. Kissinger*, a case involving a warrantless wiretap of private telephones in the name of national security, the D.C. Circuit suggested that the National Security Advisor will rarely, if ever, be entitled to absolute immunity.  807 F.2d 180 (D.C. Cir. 1986) ("If performance of a national security *function* does not entitle the Attorney General to absolute immunity, then the fact that the National Security Advisor's '*entire* function is defined by the interrelated concepts of national security and foreign policy,' can hardly justify the conferral of absolute immunity upon that office as such[.]") (citation omitted).

immunity must be unequivocally expressed and "will be strictly construed, in terms of its scope, in favor of the sovereign." *Lane v. Peña*, 518 U.S. 187, 192 (1996); *see also Floyd v. District of Columbia*, 129 F.3d 152, 156 (D.C. Cir. 1997) ("[W]aivers of sovereign immunity must be unequivocally expressed in statutory text; we cannot imply a waiver of sovereign immunity[.]").

Based on the allegations in their first complaint, the plaintiffs assert that the United States does not enjoy sovereign immunity from this lawsuit because "[t]he acts complained of are violations of peremptory norms of international law as to which no person or state may claim immunity; and . . . principles of comity demand the waiver of sovereign immunity of the United States under those same limited exceptions" provided in the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1602-11, against other nations. Pls.' Opp. I at 39. These arguments misunderstand the nature of sovereign immunity. "[A]n implied waiver [of sovereign immunity] depends upon the . . . government's having at some point indicated its amenability to suit." *Princz v. Fed. Republic of Germany*, 26 F.3d 1166, 1174 (D.C. Cir. 1994). *Princz* held that "the violation of *jus cogens* norms by the Third Reich [did not] constitute[] an implied waiver of [Germany's] sovereign immunity under the FSIA."[21] *Id.*; *see also Hwang Geum Joo v. Japan*, 332 F.3d 679, 680 (D.C. Cir. 2003) ("We reject the appellants' argument that violation of a *jus cogens* norm constitutes a waiver of sovereign immunity."). Thus, not only does precedent instruct that a waiver of sovereign immunity must be explicit but it also teaches that such immunity cannot be implied unless a government has "indicated its amenability to suit" even for the most heinous of crimes against international law. *See Princz*, 26 F.3d at 1168 (atrocities during the Holocaust); *Hwang Geum Joo*,

---

[21] "Plaintiffs understand that this Court is bound by [*Princz*] and in part present a good faith argument for a change in law." Pls.' Opp. I at 39.

332 F.3d at 680 (sex slaves for Japanese soldiers).  The initial complaint – while alleging violations of the law of nations – therefore provides no grounds on which the Court may find that the United States has consented to be sued here.[22]

The amended complaint added claims against the United States under the FTCA, which "grants federal district courts jurisdiction over claims arising from certain torts committed by federal employees in the scope of their employment, and waives the government's sovereign immunity from such claims."  *Sloan v. HUD*, 236 F.3d 756, 759 (D.C. Cir. 2001) (citing 28 U.S.C. §§ 1346(b), 2674).  Prior to filing suit under the FTCA, however, a putative claimant must exhaust an administrative process:

> An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail.  The failure of an agency to make final disposition of a claim within six months after it is filed shall, at the option of the claimant anytime thereafter, be deemed a final denial of the claim for purposes of this section.

28 U.S.C. § 2675(a); *see also McNeil v. United States*, 508 U.S. 106, 113 (1993) ("The FTCA bars claimants from bringing suit in federal court until they have exhausted their administrative remedies.").  According to the initial complaint, "[a]s to . . . any claims for which Plaintiffs are required to exhaust administrative remedies prior to suit, Plaintiffs have made the appropriate

---

[22]   The ATCA also does not contain a waiver of sovereign immunity.  *Industria Panificadora, S.A. v. United States*, 957 F.2d 886, 887 (D.C. Cir. 1992).

administrative filings, and will amend this complaint when those are resolved." Compl. I ¶ 3. The amended complaint includes an eighth claim for relief under the FTCA, described as "[n]egligent failure to prevent summary execution, arbitrary detention, cruel, inhuman or degrading treatment, torture, wrongful death and assault and battery[,]" as well as an additional count for intentional infliction of emotional distress. Compl. II at 22-23. The plaintiffs assert that their FTCA claims "were presented to the Department of State and Central Intelligence Agency" and that they "have exhausted administrative remedies[.]" *Id.* ¶ 9; *see also* Pls.' Opp. II at 3 ("Plaintiffs waited six months, as required by § 2675(a), for formal disposition of these claims before filing the Amended Complaint that includes claims based upon the FTCA."). The plaintiffs argue that *McNeil* is inapplicable because, unlike the plaintiff in that case, their initial complaint was not based upon FTCA jurisdiction. Pls.' Opp. II at 4.

The question presented is not, as the plaintiffs suggest, whether the initial complaint was explicitly based on FTCA jurisdiction but whether that pleading advanced claims against the United States for money damages for injury "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment . . . ." 28 U.S.C. § 2675(a). The initial complaint sued the United States for damages based on orders allegedly given by former President Nixon to prevent Dr. Allende from serving as President in Chile.[23] *See* Compl. I ¶ 18. While the former President is not a named defendant,[24] the basis for this

---

[23] The initial complaint specifically named the United States as a defendant and also set forth an argument that the United States had waived its sovereign immunity. The Court would be more inclined to rule that the initial complaint did not allege claims subject to § 2675 if the United States had not been included as a defendant therein.

[24] *See Nixon v. Fitzgerald*, 457 U.S. 731, 756 (1982) ("[W]e think it appropriate to recognize (continued...)

lawsuit, as initially pled, lay with his directions to Dr. Kissinger and Mr. Helms as the predicate wrongful acts.[25]  Therefore, the initial complaint met the definition of the FTCA for "a claim against the United States" under § 2675(a); it was necessary for the plaintiffs to complete the administrative process before coming to court.  *See McNeil*, 508 U.S. at 113.

"Allowing claimants generally to bring suit under the FTCA before exhausting their administrative remedies and to cure the jurisdictional defect by filing an amended complaint would render the exhaustion requirement meaningless and impose an unnecessary burden on the judicial system." *Duplan v. Harper*, 188 F.3d 1195, 1199 (10th Cir. 1999).[26]  The United States is immune from suit except to the extent – *i.e.*, the exact manner in which – it consents.  Any waiver of sovereign immunity expressed in the FTCA is unavailable to the plaintiffs in *this* case.[27]

---

[24](...continued)
absolute Presidential immunity from damages liability for acts within the 'outer perimeter' of his official responsibility.").

[25]  The Court has already determined that Dr. Kissinger was acting within the scope of his employment. *See supra* Part III.B.1.  Further, the plaintiffs acknowledge that Dr. Kissinger and Mr. Helms "were Executive Branch employees and that their acts touched upon foreign relations[.]" Pls.' Opp. I at 14.

[26]  Because the Government expressly agreed in *Duplan* that the amended complaint could be treated as starting a new lawsuit, the Tenth Circuit did not rule on this basis.

[27]  The plaintiffs assert in their second opposition brief that they also seek a declaratory judgment against the United States, in addition to money damages.  Although the amended complaint rests jurisdiction in part on the Administrative Procedure Act, 5 U.S.C. § 702, none of the Claims for Relief appears to request a judicial declaration and the Prayer for Relief does not mention a declaratory judgment.  Both of these sections, however, refer to compensatory and punitive damages.  In any event, because the claims here concern foreign and national security policy directives of the President, the Court believes that issuing discretionary equitable relief would be particularly inappropriate.

**IV.  CONCLUSION**

        The plaintiffs' claims present a non-justiciable political question on foreign policy decisions undertaken by the Executive Branch in 1970.  The plaintiffs' remedy, if any, must be found in the Congress.  In the alternative, the Court finds that Dr. Kissinger was properly certified as acting within the scope of his employment *vis-a-vis* the relevant events.  The United States will be substituted for him as the sole defendant.  With this substitution, the amended complaint is barred by the doctrine of sovereign immunity.  Both of the defendants' motions to dismiss will be granted. A separate order accompanies this memorandum opinion.


/s/ _____
ROSEMARY M. COLLYER
United States District Judge

DATE:  March 30, 2004